IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DIONNE MARIE NADON, | CV 23–72–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| MARTIN O'MALLEY, *Commissioner of Social Security*, | |
| Defendant. | |

Plaintiff Dionne Marie Nadon brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits and supplemental social security income under Titles II and XVI of the Social Security Act. The Court affirms the Commissioner's decision.

## BACKGROUND

Nadon protectively filed an application for disability benefits under Title II in April 2015 and an application for supplemental social security income under Title XVI in May 2016. (Doc. 6 at 241.) Nadon alleged a disability onset date of March 27, 2015. (*Id.* at 99, 241, 245.) Nadon's disability claim is based on impairments related to a bulging disc in her back, fibromyalgia, other chronic pain, anxiety, depression, and PTSD. (*Id.* at 287.) Nadon's claims were denied initially

1

in August 2015 and upon reconsideration in January 2016.  (*Id.* at 99.)  Nadon filed

a written request for a hearing and a hearing was held by an ALJ in November

2016.  (*Id.*)  On January 11, 2017, the ALJ issued a decision denying Nadon's

claims after conducting the requisite five-step analysis and determining that Nadon

had the residual functional capacity to return to her past work as a cashier checker.

(*Id.* at 107.)

Nadon then filed an appeal with the Social Security Appeals Council.  (*Id.* at

10.)  On March 2, 2018, the Appeals Council denied Nadon's request for review,

thereby rendering the ALJ's decision the final decision of the Commissioner.  (*Id.*)

Nadon subsequently sought judicial review of the Commissioner's decision in this

Court and the Court affirmed the Commissioner's decision.  (*Id.* at 689–710.)

Nadon then appealed this Court's judgment affirming the Commissioner's denial

of her claims to the Ninth Circuit Court of Appeals.  (*Id.* at 712–14.)

On May 25, 2021, the Ninth Circuit remanded the matter to the

Commissioner for further proceedings.  (*Id.* at 725.)  In its decision, the Ninth

Circuit primarily focused on the ALJ's consideration of treatment notes by Dr.

Michael Newman, a psychiatrist who had diagnosed Nadon with major depression

and PTSD.  (*Id.* at 716.)  The court noted that Nadon's benefits application, Dr.

Newman's treatment notes and mental assessment, and Nadon's brief on appeal all

discussed PTSD, yet the ALJ, this Court, and the Commissioner had all either

2

overlooked the PTSD diagnosis or conflated it with depression.  (*Id.* at 720.)  The court also noted that the Appeals Council, this Court, and the Commissioner had "confused the record relating to Dr. Newman's treatment notes to discount Nadon's diagnosis" and that "[m]isunderstanding the temporal scope of a medical opinion is error" and "rejecting a medical opinion because it was rendered retrospectively is not a legitimate basis."  (*Id.* at 720–21.)  Finally, the court discussed the ALJ's failure to fully consider Nadon's subjective testimony in light of Dr. Newman's treatment notes.  (*Id.* at 722.)  Ultimately, the Ninth Circuit concluded that "the ALJ's failure to address Dr. Newman's medical opinion generally, and specifically with respect to the PTSD diagnosis, was legal error that was not harmless."  (*Id.* at 723.)

Following remand, the Appeals Council vacated the final decision of the Commissioner and remanded the matter to an ALJ for further proceedings consistent with the Ninth Circuit's order.  (*Id.* at 728.)  On February 23, 2023, the ALJ held a telephonic hearing, which Nadon attended.  (*Id.* at 603.)  On March 13, 2023, the ALJ issued a second decision, again denying Nadon's claims after conducting the requisite five-step analysis.  (*Id.* at 603–18.)  Nadon now seeks judicial review of the ALJ's decision rendered on March 13, 2023.

LEGAL STANDARDS

## I.      Standard of Review

42 U.S.C. § 405(g) allows limited judicial review of Social Security benefit determinations after the Commissioner, following a hearing, has entered a final decision. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). The Court may set aside the Commissioner's decision "only if it is not supported by substantial evidence or is based on legal error." *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U. S. 197, 229 (1938)). If the ALJ's decision is supported by such evidence and the ALJ applied the correct legal standards, the Court must affirm the Commissioner's adoption of that decision. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews*, 53 F.3d at 1039. Thus, "[w]here evidence is susceptible to more than one rational interpretation," the Court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The Court will not reverse an ALJ's decision for errors that are harmless. *Id*.

## II.     Disability Determination

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that: (1) they suffer from a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(1)(A), (2)(A).

In determining whether a claimant qualifies as disabled under the Social Security Act, the ALJ follows a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920.  In steps one through four, the claimant bears the burden of establishing disability.  *Burch*, 400 F.3d at 679.  If they meet this burden, the burden of proof shifts to the Commissioner in step five.  *Id.*

In step one of the evaluation, the ALJ determines whether the claimant is engaged in substantial gainful activity.  *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is, then they are not disabled under the meaning of the Social Security Act.  *Id.*  If they are not, the ALJ proceeds to the second step in the evaluation.

In step two, the ALJ determines whether the claimant has any impairments—singly or in combination—that qualify as severe under the

5

applicable regulations and have lasted or are expected to last at least twelve (12) months.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments qualifies as severe if it "significantly limits your physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant does not have a severe impairment, the claimant is not disabled within the meaning of the Social Security Act.  *Id.*  If the claimant has a severe impairment, the ALJ proceeds to the third step.

In step three, the ALJ compares the claimant's impairments to the listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is disabled.  *Id.*  If the claimant's impairments do not, the ALJ proceeds to step four.  If the evaluation continues beyond step three, the ALJ must assess the claimant's residual functional capacity ("RFC").  *Id.* §§ 404.1520(e), 416.920(e).  A claimant's residual functional capacity is the most that the claimant can still do in a work setting despite the physical and mental limitations caused by their impairments and any related symptoms.  *Id.* §§ 404.1545(a)(1), 416.945(a)(1).

In step four, the ALJ determines whether the claimant retains the RFC to perform their past relevant work.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If

they do, the claimant is not disabled. *Id.* If their RFC does not permit them to engage in past relevant work, the ALJ proceeds to step five.

In step five, the ALJ determines whether, considering the claimant's RFC, age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner bears the burden to prove this and can do so through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner meets this burden, the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## DISCUSSION

The ALJ followed the requisite five-step sequential process in evaluating Nadon's claim. At step one, the ALJ found that Nadon "engaged in substantial gainful activity during the following periods: July 2021 through 2022." (Doc. 6 at 606.) However, the ALJ also concluded that there "has been a continuous 12-month period(s) during which [Nadon] did not engage in substantial gainful activity," and went on to evaluate steps two through five. (*Id.*)

At step two, the ALJ determined that, through the date last insured, Nadon had the following severe impairments: degenerative disc disease of the spine, fibromyalgia, depressive disorder, anxiety disorder, and PTSD. (*Id.*) The ALJ

determined that these impairments significantly limit Nadon's ability to perform basic work functions.  (*Id.*)

At step three, the ALJ determined that Nadon did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 507.)  The ALJ found that, through the date last insured, Nadon had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) as follows:

> lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; stand and/or walk about six hours in an eight-hour workday with normal work breaks; sit about six hours in an eight-hour workday with normal work breaks; frequently reach overhead with the bilateral upper extremities; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance stoop, kneel, and crouch; occasionally crawl; and avoid concentrated exposure to extreme cold, vibration, and work hazards, including unprotected heights and dangerous machinery. Normal work breaks are defined as breaks occurring every two hours, with two breaks lasting at least 10 minutes and one break lasting at least 30 minutes. The claimant is able to understand, remember, and carry out simple and detailed tasks, but not complex tasks. She is able to maintain attention, concentration, persistence, and pace for such tasks during eight-hour workdays and 40-hour workweeks. The claimant is also able to tolerate occasional interactions with supervisors, coworkers, and members of the public, but she is able to tolerate one-on-one interaction with patients or clients. Finally, the claimant is able to tolerate usual work situations and changes in routine work settings.

(*Id.* at 610.)

At step four, the ALJ found that Nadon is capable of performing past relevant work as personal care attendant.  (*Id.* at 616.)  Although the analysis could

have stopped at step four, the ALJ proceeded to step five and found that "there are other jobs that exist in significant numbers in the national economy that the claimant can also perform." (*Id.* at 617.)  These jobs are housekeeper (~300,000 jobs), marker (~130,000 jobs), and small products assembler (~150,000 jobs). (*Id.*) Accordingly, the ALJ found Nadon "has not been under a disability, as defined in the Social Security Act, from March 27, 2015, through [March 13, 2023]." (*Id.* at 618)

Nadon raises four issues in her briefing: (1) the ALJ improperly found that Nadon was engaged in substantial gainful activity from July 2021 through 2022; (2) the ALJ erroneously discounted Nadon's subjective testimony regarding her limitations; (3) the ALJ improperly discounted medical opinions; and (4) the ALJ erred in failing to incorporate all impairments into the vocational consultant's hypothetical question. (*See* Doc. 8.)

## I.   Exhaustion of Administrative Remedies

To begin, there is no indication in the record that Nadon filed an appeal with the Appeals Council following the ALJ's March 13, 2023, decision and therefore there is a question as to whether Nadon has adequately exhausted her administrative remedies.  As discussed above, § 405(g) provides for judicial review of "any final decision . . . made after a hearing."  This provision contains two separate elements: "first, a 'jurisdictional' requirement that claims be presented to

the agency, and second, a . . . 'requirement that the administrative remedies prescribed by the Secretary be exhausted.'"  *Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (quoting *Mathews* v. *Eldridge*, 424 U. S. 319, 328 (1976)).

Section 405(g) delegates to the Social Security Administration the authority to dictate which steps are generally required to exhaust administrative review and render a decision final.  42 U.S.C. § 405(a); *see also Sims v. Apfel*, 530 U.S. 103, 106 (2000) ("[T]he [Social Security] Act does not define "final decision," instead leaving it to the [Social Security Administration] to give meaning to that term through regulations.").  Pursuant to the Social Security Administration's implementing regulations, claimants must generally proceed through a four-step process before they can obtain review from a federal court: (1) the claimant must seek an initial determination as to his or her eligibility; (2) the claimant must seek reconsideration of the initial determination; (3) the claimant must request a hearing, which is conducted by an ALJ; and (4) the claimant must seek review of the ALJ's decision by the Appeals Council.  *See* 20 C.F.R. §§ 416.1400, 404.900. If a claimant has proceeded through all four steps on the merits, § 405(g) entitles the claimant to judicial review in federal district court.  *Id.*; *see also Smith*, 139 S. Ct. at 1772.  However, exhaustion of these steps is waivable by the Social Security Administration and failure to exhaust is excusable by the courts.  *Smith*, 139 S. Ct. at 1773–74.

10

In this case, the ALJ's Notice of Decision issued on March 13, 2023, included the following statement:

> If you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice. After my decision becomes final, you will have 60 days to file a new civil action in Federal district court. You will lose the right to a court review if you do not file a civil action during the 60-day period starting with the day my decision becomes final.

(*Id.* at 601.)  The Appeals Council did not review the ALJ's decision within 61 days of issuance of the Notice of Decision and Nadon filed her claim in this Court within 60 days after the decision became final.  (*See* Doc. 2.)  Thus, it would appear from this language combined with the Commissioner's failure to challenge exhaustion that the Commissioner has waived step four of the administrative review process and considers the ALJ's decision dated March 13, 2023, a "final decision" of the Commissioner.  *See Weinberger v. Salfi*, 422 U.S. 749, 767 (1975) ("In the present case the Secretary does not raise any challenge to the sufficiency of the allegations of exhaustion in appellees' complaint. We interpret this to be a determination by him that for the purposes of this litigation the reconsideration determination is 'final.'").  Accordingly, the Court is satisfied that Nadon's claims are ripe for judicial review.

## II.    Substantial Gainful Activity

First, Nadon argues that the ALJ "engaged in prohibited speculation" to find that Nadon engaged in substantial gainful activity from July 2021 to 2022. (Doc. 8 at 24.) A claimant cannot be found disabled if engaged in substantial gainful activity, regardless of the claimant's medical condition, age, education, and/or work experience. 20 C.F.R. §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b). Substantial gainful activity is defined as work that is both substantial and gainful. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. *Id.* §§ 404.1572(b), 416.972(b).

Generally, if a claimant has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in substantial gainful activity. *Id.* §§ 404.1574, 404.1575, 416.974, 416.975. However, if a claimant is "forced to stop or to reduce below the substantial gainful activity level after a short time because of [her] impairment," this "unsuccessful work attempt" will not be considered substantial gainful activity. *Id.* §§ 404.1574(a)(1), 416.974(a)(1). Typically, where there is not a significant change in work pattern or earnings during the relevant work period, the earnings are averaged over the entire work period. *Id.* §§ 404.1574a(a),

416.974a(a).  However, if the substantial gainful activity earnings level changes during the work period, the earnings are averaged separately for each period in which a different substantial gainful activity earnings level applies.  *Id.* §§ 404.1574a(b), 416.974a(b).

Here, the ALJ determined that Nadon had engaged in substantial gainful activity based on Nadon's reported work history and testimony.   Nadon reported that she worked as a home health aide from November 2019 to September 2020 then, in July 2021, she began working as a personal care attendant for a private pay client.  (Doc. 6 at 855.)  At the time of the hearing on February 23, 2023, Nadon was still working for the private pay client.  (*Id.* at 652.)  At the hearing, Nadon was asked about her source of income, average number of hours worked, and rate of pay:

> Q:   Okay. So, what's your source of income, other than the work? [sic]
> A:   My source of income is working, private pay, for a 98-year-old client.
> Q:   Okay. And how many hours a day do you work for this person?
> A:   Well, in November, my boyfriend totaled my car. So, I picked up some more hours. And I was working 17, but starting on the 26th, it's going back down to 14 hours—on Sunday, the 26th, Because I already—I got a car.
> Q:   Okay. So, are you saying 17 hours a week?
> A:   Yes, I was.
> Q:   And it's going back to 14 hours per week, because you got a car? It that right?
> A:   Correct.
>       . . . .
> Q:   How long have you been working for this particular client?

13

A:      I believe two years.
Q:      And what do you make an hour?
A:      I make $20 an hour.
Q:      I'm sorry. What?
A:      $20.
Q:      $20 an hour?
A:      Yes.

(*Id.* at 652–53.)

Based on this exchange, the ALJ concluded that Nadon had averaged 14 to
17 hours per week since 2021 at a rate of $20 per hour. (*Id.* at 606.) The ALJ
multiplied 14 hours per week by four weeks by $20 per hour and came to a total of
$1,120 in monthly earnings for those months where Nadon worked only 14 hours a
week. (*Id.*) Running the same calculation for the months where Nadon averaged
17 hours a week, the ALJ came to a total of $1,360 per month. (*Id.*) The ALJ then
concluded:

> Without the benefit of more specific evidence on the claimant's
> earnings, the undersigned finds that the claimant engaged in
> [substantial gainful activity] from July 2021 through 2022, and at
> minimum engaged in [substantial gainful activity] from November
> 2022 through December 2022, the period in 2022 that [Nadon] admitted
> in her testimony to working 17 hours every week to save up for a car.
>
> In the alternative, throughout the relevant period, [Nadon] is capable of
> performing past relevant work and making a successful adjustment to
> other work that exists in significant numbers in the national economy.

(*Id.*) The ALJ did not find that Nadon had engaged in substantial gainful
activity from March 27, 2015, through July 2021 or January 1, 2023, through
the date of the hearing.

14

Nadon contends that the ALJ's finding regarding substantial gainful activity is not supported by substantial evidence in the record because the ALJ improperly relied on speculation regarding her rate of pay during the relevant period.  (Doc. 8 at 26.)  The Commissioner responds that substantial evidence supports the ALJ's finding.  (Doc. 11 at 3.)  The Court concludes that the ALJ erred when finding that Nadon was engaged in substantial gainful activity from July 2021 through 2022.

Nadon's testimony and self-reporting establish that Nadon worked 14 hours per week as a personal care attendant for a private pay client from July 2021 through November 2022.  From November 2022 until February 2023 Nadon increased her hours to 17 hours per week in order to save up for a car. At the time of the hearing in February 2023, Nadon was earning $20 per hour at this job.  It is not clear whether Nadon earned $20 per hour throughout the relevant time period as assumed by the ALJ, but the Court finds that the ALJ's interpretation of Nadon's testimony regarding her rate of pay is a rational one.  However, the ALJ erred in calculating Nadon's monthly earnings.

During the relevant period, the monthly earnings guidelines changed annually: $1,310 per month in 2021 and $1,350 per month in 2022.  Social Security Administration, *Substantial Gainful Activity* https://www.ssa.gov/

oact/cola/sga.html (last accessed May 10, 2024).  However, the change from 14 hours per week to 17 hours per week beginning in November 2022 does not constitute a significant change in work pattern or earnings, and therefore all earnings for the 2022 work period should be averaged.  *See* 20 C.F.R. § 404.1574(a), *Example 2.*  Based on the assumed $20 per hour rate, Nadon earned $1,120 per month from July 2021 to December 2021—working 14 hours per week—$1,120 per month from January 2022 to November 2022— working 14 hours per week—and $1,360 from November 2022 to the end of December 2022—working 17 hours per week.  As such, Nadon earned an average of $1,120 per month for the 2021 work period and $1,140 for the 2022 work period.

Accordingly, Nadon was below the monthly earning guidelines from July 2021 to the end of 2022.  Even assuming that there was a significant change in work pattern or earnings beginning in November 2022, Nadon was still below the monthly earning threshold for the time period from July 2021 to November 2022, yet the ALJ failed to address this discrepancy. Therefore, the ALJ erred at step one by finding that Nadon was engaged in substantial gainful activity from July 2021 to the end of 2022.

Nonetheless, the ALJ's error at step one was harmless.  An error is harmless if it is "inconsequential to the ultimate nondisability

determination." *Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020). Here, the ALJ went on to address steps two through five for the entire relevant time period and provided an alternative basis for finding that Nadon was not disabled.   Nadon contends that the ALJ's erroneous finding at step one "permeated the ALJ's evaluation" of Nadon's credibility and limitations.  (Docs. 8 at 26, 12 at 5.)  The Court disagrees.

The ALJ repeatedly referenced Nadon's work activity in evaluating Nadon's limitations; however, the ALJ's analysis did not improperly rely on the finding at step one.  "An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled." *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020) (finding that the ALJ properly considered a claimant's testimony that she was able to work occasional eight-hour shifts even though the work activity did not amount to substantial gainful activity).  Like in *Ford*, the ALJ properly considered Nadon's testimony regarding her work activity regardless of the finding at step one. For example, when evaluating Nadon's subjective symptom testimony, the ALJ found that Nadon's "daily activities and work activity during the relevant period are not as limited as one would expect from an individual alleging disability," and noted that as a personal care attendant Nadon cooked and performed light housework.  (Doc. 6 at 612.)

Accordingly, the Court concludes that the ALJ erred in finding that Nadon engaged in substantial gainful activity from July 2021 to the end of 2022. However, this error was harmless because the ALJ proceeded through steps two through five for the relevant time period and provided an alternative basis for finding Nadon was nondisabled that did not rely on the erroneous finding at step one.

### III.   Subjective Symptom Testimony

Nadon next argues that the ALJ improperly discounted her subjective symptom testimony "without setting forth the required specificity in support of such a finding." (Doc. 8 at 33.) Where, an ALJ "determines that a claimant . . . is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488–89 (9th Cir. 2015). The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

18

undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493.
The ALJ need only provide one valid reason for discounting the claimant's
testimony, so long as that reason is not simply a lack of supporting medical
evidence. *See Gilliland v. Saul*, 821 F. App'x 798, 799 (9th Cir. 2020) ("[If
the] ALJ provided at least one valid reason to discount [the claimant's
symptom] testimony, error in remaining reasons is harmless[.]") (citation
omitted); *Valdez v. Berryhill*, 746 F. App'x 676, 677 (9th Cir. 2018) (noting
that an "ALJ may properly include lack of supporting medical evidence in
the reasons to discredit claimant testimony as long as it is not the only
reason").

Nadon alleged disability primarily due to chronic back pain, upper
and lower extremity pain (fibromyalgia), and persistent symptoms of
anxiety, depression, and PTSD.  In her 2015 function report, Nadon reported
pain and fatigue stemming from her fibromyalgia that causes difficulty
walking more than 15 feet, bending, standing, and lifting.  (Doc. 6 at 308,
313.)  Nadon reported difficulty with the following activities: lifting more
than five pounds, squatting, bending, standing, walking, sitting, kneeling,
stair climbing, memory, concentration, and using her hands.  (*Id.* at 313.)
At the hearing on February 23, 2023, Nadon testified to the same limitations
and stated that she could only work part-time.  (*Id.* at 641–51.)  Nadon also

testified that she felt able to sit and drive for only 20 minutes due to her fibromyalgia and back pain.  (*Id.*)

The ALJ found that Nadon had met her initial burden by producing evidence of medically determinable impairments that could reasonably be expected to cause her alleged symptoms.  (*Id.* at 611.)  The ALJ did not make a finding regarding malingering, but, at step two, found that Nadon's statements concerning intensity, persistence, and the limiting effects of her symptoms were not entirely consistent with the evidence in the record.  (*Id.*) In reaching this conclusion, the ALJ relied on Nadon's medical records, including medical examination results and treatment history, and Nadon's own testimony.  The Court is satisfied that the ALJ provided specific, clear, and convincing reasons for discounting Nadon's symptom testimony.

First, the ALJ reviewed Nadon's medical records regarding her physical impairments.  The ALJ noted that during examinations of the neck and spine Nadon demonstrated a full range of motion, a normal gait, normal reflexes, normal sensation, full muscle strength, and negative straight leg testing.  (*Id.* at 611.)  The ALJ also noted Nadon's treatment history, which included hip injections in November 2016 after which Nadon reported an improved ability to stand and walk for prolonged periods, pain management in 2019 and 2020, pain management again in March 2021 using opioid

medication, lumbar injections in November 2022, and lumbar/SI joint

branch blocks and bilateral suboccipital decompressions in December 2022.

(*Id.* at 612.)

Next, the ALJ addressed Nadon's medical records regarding her

mental impairments.  The ALJ noted that Nadon had received mental health

counseling and medication for depression, anxiety, and PTSD.  (*Id.*)  The

ALJ then observed that "[i]n contrast to the claimant's subjective mental

health complaints, during examinations, the claimant was repeatedly

observed with a normal mood and affect, pleasant and cooperative attitude,

normal memory, and intact attention and concentration."  (*Id.* at 612.)  The

ALJ also noted that Nadon "reported improved symptoms with conservative

care."  (*Id.*)  For example, the ALJ noted that in April 2021 Nadon reported

"overall improvements in her mood/depression. Minimal mood swings.

Anxiety moderately improving. Still significant anxiety when having to

leave the house but reports taking the Alprazolam helps significant [sic] as is

able to leave the house for activities. Sleep improved and less nightmares."

(*Id.* at 612, 1447.)  The ALJ also noted that in August 2022, Nadon reported

"improvement in her depression, mood regulation, and anxiety when she is

taking her medications consistently" and "improvements in her nightmares

with taking 6mg Prazosin."  (*Id.* at 612, 1411.)  Finally, as recently as

21

January 2023, Nadon reported that "she continues to have good control of her mood, is having less mood lability, less depression, [and] less PTSD symptoms." (*Id.* at 612, 1598.)

Based on these findings, the ALJ concluded that "the conservative treatment, the mostly normal examinations, and the statements of improved symptoms support finding the claimant's ability to perform simple and detailed work with limited social interaction." (*Id.* at 612.) The ALJ elaborated that Nadon "received pain management, injections, and branch blocks for her chronic pain, but the mostly mild findings shown by the objective imaging of the spine and the normal examinations do illustrate that the claimant has been able to perform a reduced range of light work with the limitations in the above residual functional capacity." (*Id.*)

The ALJ then went on to address the inconsistencies between Nadon's alleged symptoms and her daily activities and work activity. The ALJ noted that Nadon "reported the ability to take her daughter to school, handle personal care, perform household cleaning, prepare meals, use a computer, watch TV, shop in stores for 20 to 30 minutes, . . . handle finances," and go camping. (*Id.* at 612, 308–15, 1107.) The ALJ also noted that Nadon worked as a home health aide from November 2019 to September 2020 where she would cook, help her clients shower, and take her clients to

appointments.  (*Id.* at 612, 855.)  Then, from July 2021 into 2023, Nadon

worked as a personal care attendant where she would cook and perform light

housework.  (*Id.* at 612, 855.)  The ALJ concluded that these findings further

support that Nadon "has been able to perform a reduced range of light work

with the limitations in the above residual functional capacity" despite her

subjective testimony regarding her limitations.  (*Id.* at 613.)

Based on the foregoing, the Court is satisfied that the ALJ provided

specific, clear, and convincing reasons for discounting Nadon's testimony

regarding her symptoms and limitations.

## IV.   Medical Opinions

Nadon also argues that the ALJ erred in discounting the opinions of

her healthcare providers: Dr. Michael Newman, Dr. Todd Fife, and Dr.

David Mahoney, Licensed Clinical Social Worker (LCSW) Danielle

Kimbrell, Certified Physician's Assistants (PA-C) Robert Griffin and Tracy

Rogers, Nurse Practitioner (NP) Michelle Smith.  (Doc. 8 at 30; *see also*

Doc. 12 at 11.)   Notably, Nadon does not elaborate on this argument or

explain the ways in which the ALJ's discussion of these opinions was

deficient.  Nonetheless, the Court will review the ALJ's evaluation of these

opinions.

To begin, medical sources are divided into two categories: "acceptable medical sources" and "other sources."[1]  20 C.F.R. §§ 404.1513, 416.913 (2016).  Acceptable medical sources include licensed physicians and psychologists.  *Id.* §§ 404.1513(a), 416.913(a).  Medical sources classified as "other sources" include, but are not limited to, NPs, counselors, therapists, LCSWs, and PA-Cs.  *Id.* §§ 404.1513(d), 416.913(d).  The Court will address each category in turn.

### A. Accepted Medical Sources

Dr. Newman, Dr. Fife, and Dr. Mahoney are all "accepted medical sources."  Under the pre-2017 regulations that apply to Nadon's claim, the ALJ must give greater weight to certain medical opinions.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996).  Opinions from treating physicians receive more weight than opinions from examining physicians, and opinions from examining physicians receive more weight than opinions from non-examining physicians.  *Id.* at 830–31.  To reject the uncontradicted opinion of an examining or treating doctor, an ALJ must provide "clear and convincing" reasons supported by substantial

---

[1] In January 2017, the Social Security Administration issued revised regulations for evaluating medical evidence relating to claims filed on or after March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416).  Because Nadon filed her claims in 2015 and 2016, the Court applies the regulations in effect prior to the January 2017 revisions.

evidence. *Id.* at 830. Where the opinion of an examining or treating doctor is contradicted, the ALJ need only provide "specific and legitimate reasons" supported by substantial evidence in the record for discounting the opinion. *Id.*

i.   *Dr. Newman*

Nadon provided a mental assessment completed by Dr. Newman in March 2017 and treatment records from her visits with Dr. Newman in 2016, 2017, and 2018. (Doc. 6 at 46–48, 555–58, 1405–10.) In the March 2017 assessment, Dr. Newman reported diagnoses of major depression and PTSD. (*Id.* at 46.) Dr. Newman checked several boxes indicating that Nadon had moderate, moderate-to-marked, and marked limitations in terms of memory, concentration and persistence, social interactions, and adaptation that would have been present as far back as 2015. (*Id.* at 47.) Dr. Newman also remarked that Nadon would, on average, be likely to miss work more than three times per month as a result of her impairments. (*Id.* at 48.)

Dr. Newman's July 5, 2016, treatment records indicate that Nadon has a history of major depression and PTSD, that she has received counseling and medication for her depression, that she experiences emotional and physical pain, and that she has had thoughts of suicide. (*Id.* at 555.) The July 5 treatment notes also indicate that Nadon's concentration, insight, and

25

judgment were "good." (*Id.* at 557.) Dr. Newman's notes from July 26, 2016, indicate that Nadon was tolerating her prescription for Abilify well and that it was "giving her some relief." (*Id.* at 1409.)

On February 2, 2017, Dr. Newman noted that Nadon was feeling stressed and continued to suffer from depression and anxiety but was not feeling suicidal. (*Id.* at 1408.) Dr. Newman increased Nadon's dosage of Abilify, prescribed Xanax, and "strongly encouraged [Nadon] to resume counseling." (*Id.*) On March 27, 2017, Nadon reported to Dr. Newman that she had moved in with her boyfriend, had improved in terms of nightmares, but continued to have issues with anxiety, focus, forgetfulness, concentration, and depression. (*Id.* at 1407.) Dr. Newman again "strongly recommended she become involved in therapy" and told Nadon that he "would like to see her involved in counseling before a medication change." (*Id.*)

On May 4, 2018, Nadon reported to Dr. Newman that her relationship had ended and she continued to feel anxious and depressed but had not followed up with counseling, had stopped taking Abilify, and was not feeling suicidal. (*Id.* at 1406.) Dr. Newman again "discussed [his] strong recommendation for counseling" and recommended Nadon attend AA meetings. (*Id.*) Dr. Newman "emphatically" declined to increase Nadon's

dosage for Alprazolam (Xanax). (*Id.*) Dr. Newman discussed concerns regarding Nadon's consumption of alcohol while taking her prescription medications. (*Id.*) Finally, on March 21, 2018, Dr. Newman noted the following: "[Nadon] is doing better than I have ever seen her. Her mood is good. She is less anxious. She is not drinking. She is making positive choices. She is in a healthy relationship. . . . The current medications will be maintained." (*Id.* at 1405.)

Dr. Newman's opinion regarding Nadon's mental health limitations is contradicted by the opinions of Dr. Mary Bogumill and Dr. Lisa Renner, two state agency consultants who each reviewed the available medical evidence and submitted opinions regarding Nadon's mental limitations. (*Id.* at 159, 171.) Dr. Bogumill and Dr. Renner both concluded that Nadon's mental conditions caused the following limitations: no restriction in activities of daily living; a mild difficulty in social functioning; a mild difficulty in concentration, persistence, or pace; and no episodes of decompensation. (*Id.*) The ALJ found that these opinions were supported by a reasonable explanation and were consist with substantial evidence in the record and therefore afforded them significant weight. (*Id.* at 613.)

The Court is satisfied that the ALJ provided specific and legitimate reasons supported by substantial evidence in the record for discounting Dr.

Newman's opinions.  The ALJ gave Dr. Newman's March 2017 mental health assessment minimal weight because Dr. Newman "did not support the assessment with a reasonable explanation."  (*Id.* at 615.)  The ALJ also noted that Dr. Newman's "conservative treatment records" did not support his assessment.  (*Id.*)  In total, the ALJ concluded that the "conservative mental health treatment history, the normal mental status examinations, [Nadon's] reports of improved symptoms, and the claimant's daily activities and work activity during the relevant period are not consistent with Dr. Newman's opinion."  (*Id.*)

> ii.   *Dr. Fife*

Nadon provided a disability assessment questionnaire completed in May 2017 by her primary care provider, Dr. Fife.  In the assessment, Dr. Fife diagnosed Nadon with PTSD, depression, anxiety, chronic neck and back pain, tremors, and myofascial pain syndrome.  (*Id.* at 922.)  Dr. Fife opined that Nadon could perform a job in a seated, standing, or walking position for only one hour a day in an 8-hour workday, that Nadon would have to stand up and move around "at least hourly" for at least 20 minutes, and that Nadon must elevate both legs to waist level two-to-three times a day while sitting.  (*Id.* at 924.)  Dr. Fife also opined that Nadon could not lift or carry more than 10 pounds and has significant limitations in reaching,

handling, and fingering.  (*Id.* at 924–25.)  Dr. Fife went on to opine that
Nadon would frequently—meaning from 1/3 to 2/3 of an 8-hour workday—
experience pain, fatigue, or other symptoms that are severe enough to
interfere with Nadon's attention and concentration and that Nadon would
need to take unscheduled 20-minute breaks to rest at unpredictable intervals
every 30 minutes to one hour of an 8-hour workday.  (*Id.* at 925.)  Finally,
Dr. Fife opined that Nadon would likely be absent from work more than
three times a month.  (*Id.* at 926.)

Dr. Fife's opinions are contradicted by the opinions of Dr. Francis
Yamamoto and Dr. John Vorhies, two state agency consultants who
reviewed the medical evidence and submitted assessments regarding
Nadon's physical limitations.  (*Id.* at 160–62, 172–74.)  Dr. Yamamoto
concluded that Nadon was limited to the following: lift and/or carry 20
pounds occasionally and 10 pounds frequently; sit about 6 hours in an 8-
hour workday; stand and/or walk about 6 hours in an 8-hour workday;
periodically alternate sitting and standing as allowed by normal work breaks;
frequently stoop; occasionally climb ramps, stairs, ladders, ropes or
scaffolds; occasionally crawl; frequently reach overhead bilaterally; handle,
finger, and feel without limitation; and avoid concentrated exposure to
extreme cold, vibrations, and workplace hazards, including unprotected

heights and dangerous machinery.  (*Id.* at 160–62.)

Dr. Vorhies concluded that Nadon was limited to the following: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit about 6 hours in an 8-hour workday; stand and/or walk about 6 hours in an 8-hour workday; periodically alternate sitting and standing as allowed by normal work breaks; frequently stoop, balance, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes or scaffolds.  (*Id.* at 172–74.)  Accordingly, Dr. Vorhies found that Nadon was not as limited as determined by Dr. Yamamoto.  The ALJ found that both Dr. Yamamoto and Dr. Vorhies supported their opinions with reasonable explanations, but ultimately found Dr. Yamamoto's opinion more consistent with the evidence in the record and therefore afforded Dr. Yamamoto's opinion significant weight.  (*Id.* at 613.)

The Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence in the record for discounting Dr. Fife's opinion.  The ALJ gave Dr. Fife's opinion "minimal weight."  (*Id.* at 616.)  The ALJ noted that the "record does not contain significant treatment records from Dr. Fife" and the assessment "is not consistent with the clinical observations [of] a full range of motion of the neck and spine, a normal gait, normal reflexes, normal sensation, full muscle strength, and negative straight

leg testing" or "the lack of marked abnormalities shown by the imaging of [Nadon's] spine." (*Id.*) The ALJ then added that Dr. Fife's assessment is inconsistent with evidence in the record demonstrating that Nadon worked as a home health aid from November 2019 to September 2020 and as a personal care attendant from July 2021 into 2023. (*Id.*)

### iii.   Dr. Mahoney

Nadon provided a consultative mental status evaluation completed by Dr. Mahoney in June 2015. (*Id.* at 417.) In the evaluation, Dr. Mahoney noted that Nadon "provided normal attention and focus," had normal recall, "related well with normal eye contact," and was "friendly and cooperative" but "sad and anxious when discussing her physical symptoms." (*Id.* at 419.) Dr. Mahoney also noted that Nadon's "thoughts and language were logical" and she "demonstrates normal judgment, realistic reality testing, and reasonable insight" but her "intelligence is likely suspected to be on the lower end of average." (*Id.*)

During the evaluation, Nadon "indicated that her primary stresses are pain related" and her "constant physical pain and muscle fatigue is a constant daytime interference." (*Id.*) Dr. Mahoney concluded that, at the time of the evaluation, Nadon's "anxiety symptoms appear more significant than her depressive symptoms" and Nadon "would benefit from counseling

and psychotherapy," although Nadon indicated she was not likely to pursue these options.  (*Id.* at 420.)  Nadon also indicated an interest in "learn[ing] how she may benefit from vocational services."  (*Id.*)  Dr. Mahoney ultimately opined that Nadon "appears able to engage in some level of work activity" and "would benefit from services that could facilitate job placement for her" but she needs medical attention for her health issues and suffers from "major depressive disorder, recurrent, mild in severity with anxious distress."  (*Id.*)

Because Dr. Mahoney did not offer an opinion regarding Nadon's functioning or limitations, his opinion is not directly contradicted by the opinions of the aforementioned state consultative examiners.  The Court is satisfied that the ALJ provided clear and convincing reasons supported by substantial evidence in the record for discounting Dr. Mahoney's opinion. Although Dr. Mahoney "reported a mostly normal mental status examination," the ALJ gave Dr. Mahoney's evaluation "minimal weight" because Dr. Mahoney did not offer a specific medical opinion on Nadon's functioning or limitations, the conclusion was inconsistent with the evaluation itself, and "the conservative mental health treatment history, the normal mental status examinations, [Nadon's] reports of improved

symptoms, and [Nadon's] daily activities and work activity during the relevant period are not consistent with Dr. Mahoney's opinion." (*Id.* at 614.)

### B. Other Sources

NP Michelle Smith, LCSW Danielle Kimbrell, PA-C Robert Griffin, and PA-C Tracy Rogers are all "other sources." An ALJ must consider "other source" opinions, at a minimum, as lay witness testimony that cannot be disregarded without comment, but which an ALJ may discount by providing reasons that are germane to each witness. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.").

### i.   NP Michelle Smith

Nadon provided a note written by NP Smith in February 2016 and a disability impairment questionnaire completed by NP Smith in May 2016. In the February 2016 note, NP Smith wrote that Nadon was "not able to work at this time" due to chronic back pain and fibromyalgia "and would not be able to return to work within the next 12 months." (*Id.* at 423.)  In the May 2016 questionnaire, which was co-signed by Dr. Martin-Thompson, NP

33

Smith indicated that Nadon suffers from chronic low back and neck pain but offered no opinion as to Nadon's functional capacity.  (*Id.* at 528–32.)

In her previous challenge to the Commissioner's final decision denying her claims, Nadon argued that the ALJ failed to provide sufficient reasons for discounting these two opinions.  (*Id.* at 695.)  The Commissioner argues that the "law of the case" doctrine precludes Nadon from relitigating this issue.  (Doc. 11 at 6.)  The law of the case doctrine generally prohibits a court from considering an issue that has already been decided—either explicitly or by necessary implication—by that same court or a higher court in the same case.  *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012); *United States v. Lummi Nation*, 763 F.3d 1180, 1187 (9th Cir. 2014).  In deciding whether to apply the doctrine, the Court must keep in mind that "[t]he doctrine is concerned primarily with efficiency[] and should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust."  *Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016); *see also Lower Elwha Band of S'Klallams v. Lummi Indian Tribe*, 235 F.3d 443, 452–53 (9th Cir. 2000).  Although appropriate under these circumstances, the Court declines to apply the law of the case doctrine because it would offer minimal benefit in terms of efficiency.

Although NPs are typically "other sources," an NP's opinions can be considered those of an accepted medical source where the NP worked closely with, and under the supervision of, a physician. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011). Here, NP Smith's treatment notes do not suggest that she was working closely with or under the supervision of Dr. Martin-Thompson while treating Nadon. Dr. Martin-Thompson did not sign NP Smith's treatment notes or February 2016 note. However, Dr. Martin-Thompson did co-sign the May 2016 disability impairment questionnaire. The Court will therefore treat NP Smith's opinions contained in the May 2016 questionnaire as that of an acceptable medical source. Furthermore, NP Smith's opinions are contradicted by the opinions of the state consultative examiners, as discussed above. Therefore, the ALJ need only provide specific and legitimate reasons for discounting NP Smith's May 2016 opinion and germane reasons for discounting NP Smith's February 2016 opinion.

The Court is satisfied that the ALJ provided a sufficient basis for discounting both of NP Smith's opinions. The ALJ afforded NP Smith's opinions "minimal weight" because "the impairment questionnaire was left largely incomplete, and [NP Smith] noted [she] was not qualified to evaluate an individual for functional capacity or provide disability ratings," and "the

opinions are vague and nonspecific regarding [Nadon's] functional limitations," "lack a reasonable explanation," and "are inconsistent with treatment records." (*Id.* at 614.) The ALJ also noted that Nadon was observed by NP Smith to have a normal gait, normal range of motion of spine, no SI joint pain, normal reflexes, normal sensation, and normal motor strength. (*Id.*) Even assuming the February 2016 note is entitled to the same standard as the May 2016 questionnaire, the Court concludes that the ALJ has met this burden.

   *ii. Danielle Kimbrell, LCSW*

   Nadon provided a mental impairment questionnaire completed by LCSW Kimbrell in May 2016, in which LCSW Kimbrell diagnosed Nadon with PTSD, major depressive disorder, and fibromyalgia and assigned Nadon a Global Assessment of Functioning (GAF) score of 52. (*Id.* at 536.) LCSW Kimbrell noted certain limitations in Nadon's functions and opined that Nadon "would be unable to work in public settings and sometimes cannot leave the house" due to her social anxieties and would "almost always" be absent from work as a result of her impairments. (*Id.* at 539–40.) In November 2016, LCSW Kimbrell provided a letter in which she reported that Nadon's "medical diagnosis of fibromyalgia has caused her much physical distress and has negatively also [sic] impacted her mood state." (*Id.*

at 581.)  She again stated that Nadon meets the criteria for PTSD and major

depressive disorder.  (*Id.*)

The ALJ gave LCSW Kimbrell's May 2016 opinion, and specifically

the GAF score, "some weight" and considered it "along with all of the other

evidence of record in determining the claimant's [RFC]."  (*Id.* at 615.)

However, the ALJ noted the following with regard to GAF scores:

> GAF scores are inherently subjective, one-time assessments of overall
> functioning, and the criteria for forming such scores are poorly
> defined and vary from one psychological professional to another.
> Although a GAF score can offer some evidence regarding the severity
> of the claimant's mental impairment, it is not dispositive on the issue.
> A GAF score is a mere snapshot of the claimant's ability to function
> at the particular time of the assessment. Moreover, it is an assessment
> of many factors of which the claimant's mental diagnosis and
> associated limitations are but a few.

(*Id.*)  The ALJ afforded the November 2016 letter "minimal weight" because

it offered no opinion as to Nadon's functional capacity and LCSW Kimbrell

lacks expertise in physical issues such as fibromyalgia.  (*Id.*)  These

constitute germane reasons for discounting LCSW Kimbrell's opinions.

### iii.   Robert Griffin, PA-C

Nadon provided records from various office visits with PA-C Griffin

from 2018 and 2019.  (*Id.* at 1262–66; 1271–75, 1281–85, 1288–91, 1294–

98, 1306–10.)  Based on these records, it appears that PA-C Griffin worked

alongside NP Smith.  In these records, PA-C Griffin noted Nadon's

subjective complaints, examination results, medical history, family and
social history, medications, and treatment plan.  (*See id.*)  However, PA-C
Griffin did not offer an opinion as to Nadon's residual functional capacity or
disability status.  (*See id.*)

Contrary to Nadon's argument, the ALJ did consider these treatment
notes.  For example, at step three the ALJ relied, in part, on the treatment
notes to conclude that "[l]istings 1.15 and 1.16 are not met because the
record does not include evidence of muscle weakness with either sensory
changes or decreased deep tendon reflexes."  (Doc. 6 at 607, 1266, 1274,
1283, 1296, 1308.)  The ALJ also referenced PA-C Griffin's notes when
finding that Nadon "had a good rapport with providers, was described as
pleasant and cooperative, and appeared comfortable during appointments."
(*Id.* at 609.)  Finally, the ALJ referenced PA-C Griffin's notes in finding that
Nadon experienced no limitation in "adapting or managing" herself.  (*Id.* at
609, 1265, 1274.)  The ALJ also referenced PA-C Griffin's notes when
determining Nadon's residual functional capacity, noting that "examiners
observed a normal gait, normal reflexes, normal sensation, full muscle
strength, and negative straight leg testing."  (*Id.* at 611, 616, 1266, 1274,
1283, 1296, 1308.)

Thus, there is no indication that the ALJ rejected or discounted PA-C

38

Griffin's treatment notes.  Nadon does not make any specific arguments regarding how the ALJ erred in considering this evidence.  Therefore, the Court is satisfied that the ALJ sufficiently considered PA-C Griffin's notes.

      *iv.    Tracy Rogers, PA-C*

Finally, Nadon provided a disability evaluation completed by PA-C Rogers in June 2015.  (*Id.* at 404.)  The evaluation is based on PA-C Rogers's review of the available medical record, her own examination of Nadon, and additional imaging of Nadon's cervical spine.  (*Id.*)  PA-C Rogers concluded that "many of the complaints [Nadon] has are affecting her ability to work. I am not sure to what degree." (*Id.* at 413.)  However, PA-C Rogers went on to opine on Nadon's functional limitations, finding that Nadon can only stand or walk for a few minutes, must change position due to pain, and "cannot carry weights, groceries, etc."  However, PA-C Rogers also opined that Nadon had "grossly intact grip strength, very strong, but it fatigues easily bilaterally," "[h]er gait and station are intact," she has "excellent range of motion", and she could use her arms and legs for light tasks or light [activities]." (*Id.*)

As with NP Smith, the Court previously addressed the ALJ's evaluation of PA-C Rogers's opinion and determined that the ALJ had provided sufficient reasons for discounting this opinion.  (*Id.* at 705–06.)

However, the Court will again decline to apply the law of the case doctrine because the interest in efficiency in negligible.  The Court again finds that the ALJ provided germane reasons for discounting PA-C Rogers's opinion. The ALJ afforded PA-C Rogers's opinion "minimal weight" but acknowledged that the opinion "is in part consistent with evidence of record, which supports limiting the claimant to light work and limited reaching." (*Id.* at 614.)  The ALJ identified inconsistencies with the clinical observations and treatment records, "[f]or example, the claimant demonstrated grossly intact grip strength, full range of motion of the extremities, full muscle strength, and a normal gait," and found the opinion over-reliant on Nadon's subjective complaints or on speculation.  (*Id.*)

## V.      Vocational Expert Hypothetical

Finally, Nadon argues that the ALJ erred by posing a hypothetical to the vocational expert that does not accurately reflect Nadon's limitations.  (Doc. 8 at 35.)  In hypotheticals posed to vocational experts, the ALJ must only include those limitations supported by substantial evidence.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006).  Yet, the ALJ is also obligated to propound a complete hypothetical question, and if the ALJ fails to do so, the answers cannot amount to substantial evidence.  *Id.*  In addition, "[i]f the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no

40

evidentiary value." *Lewis*, 236 F.3d at 517; *Wolfram v. Comm'r of Soc. Sec. Admin*, 351 F. App'x 241, 243 (9th Cir. 2009).

The ALJ asked the vocational expert to consider a hypothetical person with the same age, work experience, and educational background as Nadon who possessed the same limitations as Nadon, as described above. (Doc. 6 at 655–56.) The ALJ asked the vocational expert whether the hypothetical person could perform Nadon's past work and/or any jobs that exist in significant numbers in the national economy. (*Id.* at 656.) The vocational expert responded that such a hypothetical person could perform Nadon's past work as a personal care attendant and could also perform work a housekeeper cleaner, marker, and small products assembler, which exist in significant numbers in the national economy. (*Id.* at 656–57.)

Nadon argues that the ALJ erred by failing to incorporate "the uncontested limitations of the treating psychologists, doctors, [LCSWs], and [NPs]." (Doc. 8 at 35.) Nadon does not specify which limitations the ALJ failed to incorporate, but, throughout her brief, Nadon points to various medical and lay opinions and objective medical evidence in the record that, in her view, support her claim of disability. (*Id.* at 28–29, 31–32.) However, as discussed above, the ALJ properly considered all medical evidence and opinions that were offered and properly discounted the opinions that he gave minimal or limited weight. Moreover, the

relevant inquiry "is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding." *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). The Court finds that the hypothetical posed to the vocational expert was complete and incorporated Nadon's limitations as found by the ALJ and supported by substantial evidence in the record.

CONCLUSION

The Court finds that the ALJ erred at step one by finding that Nadon had engaged in substantial gainful activity from July 2021 through 2022. However, the ALJ's error at step one was harmless because it was ultimately inconsequential to the ALJ's finding that Nadon is not disabled. The ALJ did not otherwise err in finding Nadon not disabled under the Social Security Act. The Court is also satisfied that the ALJ complied with the Ninth Circuit's directive to consider Nadon's PTSD diagnosis and Dr. Newman's treatment notes more fully.

Accordingly, IT IS ORDERED that the Commissioner's decision is AFFIRMED.

DATED this 28th day of May, 2024.

Dana L. Christensen, District Judge
United States District Court